# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>205 W. FAIRVIEW BLVD.<br>INGLEWOOD, CA 90302 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.  2:21-MJ-03562 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 402, 1344, 1349, 1956; 21 U.S.C. §§ 841 and 846; and 26 U.S.C. § 7201. | See affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Lyndon Versoza
_____
*Applicant's signature*

Postal Inspector Lyndon Versoza
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Hon. John E. McDermott, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

## ATTACHMENT A

## PREMISES TO BE SEARCHED

The premises to be searched is:

205 W FAIRVIEW BLVD., INGLEWOOD, CA 90302 (the HUDSON PREMISES). The HUDSON PREMISES is a single-story, single-family dwelling located on the northern side of West Fairview Boulevard, just west of North Eucalyptus Avenue in Inglewood, California.  On the curb in front of the house are the numbers "205" painted in black.  The façade of the house has tan-colored wooden or wood-like slats with white window trim and a brick chimney. The roof appears to be tan colored asphalt and has two white-colored gable dormers.  Surrounding the front yard of the property is wrought iron and stucco fencing.  The fence bounds the property on the left and right and extends to the rear of the lot, but becomes solid beyond the front yard.  The driveway is protected by a security gate and leads back to a garage that appears to have been extended.  The premises to be searched includes the entire lot, the structures on it, and any vehicles on the premises owned or controlled by Stanley Hudson.

**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 402 (contempt), 1344, 1349 (bank fraud conspiracy), and 1956 (money laundering), 21 U.S.C. §§ 841 and 846 (drug trafficking), and 26 U.S.C. § 7201 (tax evasion) (the "Target Offenses"), namely:

a.   Controlled substances, precursor chemicals, and related items and paraphernalia such as cutting and packaging material, scales, pay-owe sheets, and documents and records referring or relating to the same, including those that are opaque as to units (e.g., "I need ten right now").

b.   Firearms and related items such as ammunition and holsters, money counters, and documents referring or relating to the same;

c.   Documents and records referring or relating to law enforcement or bank investigations, accounts being frozen or closed or at risk of the same, currency transaction reports, and manipulating transaction amounts to avoid scrutiny;

d.   Records, programs, and items relating to the counterfeiting or manipulation of documents and identifications, such as the cutting-and-pasting of signatures, letterheads, watermarks, and seals, including the altered or counterfeited information itself.

e.   Documents and records referring or relating to cash transactions totaling over $10,000 or the purchase of more than $3,000 of postal money orders in a two-week period, or conducting multiple cash ATM transactions or purchasing multiple postal money orders on the same day;

f.    Documents and records referring or relating to having one person conduct financial transactions on behalf of a different person, or which purport to show a person-to-person loan or payment on such a loan of at least $1,000;

g.    Mail matter and shipping packages, opened or unopened, not addressed to or from 205 W FAIRVIEW BLVD., INGLEWOOD;

h.    Personal identifying information of individuals other than those residing at 205 W FAIRVIEW BLVD., INGLEWOOD, including social security numbers, other identifying numbers, dates of birth, credit, debit card, or other account information, PINs, credit reports, and bank or other financial institution information, and records referring or relating to such information;

i.    Records relating to wealth and the movement of wealth since 2009, such as tax returns and forms, crypto-currency accounts and transfers, other digital wealth storage and transfer methods including PayPal and Venmo, money orders, brokerage and financial institution statements, wire transfers, currency exchanges, deposit slips, cashier's checks, transactions involving prepaid cards, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, real estate mortgage initial purchase loans or loan refinances, residential property leases, escrow accounts, the purchase, sale, or leasing of automobiles or real estate, or auto loans, and investments, or showing or referring to purchases or transactions for more than $1,000;

j.    Records or items containing indicia of occupancy, residency or ownership of any location or vehicle being searched, such as keys, rental agreements, leases, utility bills, identity documents, cancelled mail, and surveillance video;

k.    Currency, money orders, and casino chips with a value in excess of $1,000, including the first $1,000 if more than $1,000 is found, precious metal coins and bullion, and prepaid debit or credit cards;

l.    Cryptocurrency and related records and items, such as those referring or relating to public or private keys or addresses, or cryptocurrency wallets or their parts, including "recovery seeds" or "root keys" which may be used to regenerate a wallet.  Seizure of the cryptocurrency and wallets will be accomplished by transferring or copying them to a public cryptocurrency address controlled by the United States, or by restoring them onto computers controlled by the United States.

m.    Documents and keys relating to public storage units, rental cars, prepaid cellular telephones, safety deposit boxes, Commercial Mail Receiving Agencies, virtual offices, or receiving mail at someone else's address, or holding or renting assets or items under someone else's name;

n.    Documents and records showing electronic and telephone contacts and numbers called or calling, such as SIM cards, address books, call histories, telephone bills, and ICQ, Telegram, and email addresses;

o.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the TARGET OFFENSES, and forensic copies thereof.

2.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.    records of or information about Internet Protocol addresses used by the device;

i.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4

3.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**II.   SEARCH PROCEDURE FOR DIGITAL DEVICES**

5.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search

as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team will not search for similar evidence outside the scope of the items to be seized without first obtaining authority to do so.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized,

6

the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the

7

investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

8.   During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumbs and/or fingers of STANLEY ALEXANDER HUDSON onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific

8

finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of that person with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant, and do not apply to any other search of digital devices.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Lyndon A. Versoza, being duly sworn, hereby depose and state
as follows:

### I. TRAINING AND EXPERIENCE

1.    I am a United States Postal Inspector employed by the
United States Postal Inspection Service ("USPIS"), Los Angeles
Division, in Los Angeles, California, where I have served since
June 2005.  Currently, I am responsible for investigating
criminal violations of money laundering and structuring laws,
such as when the services of the United States Postal Service
are employed by criminals as part of the means to launder or
conceal illicit funds, and/or avoid banking reporting
requirements.  I am also one of seven Postal Inspectors in the
US currently designated by USPIS as a Subject Matter Expert
("SME") in money laundering investigations.  As a SME, I have
spoken at money laundering conferences and provided training to
the financial and banking industry and other law enforcement
agents. I have also received both formal and informal money
laundering training from USPIS and other government and private
agencies.  During my 16-year career as a Postal Inspector, I
have investigated: mail thieves, burglars, rapists, murderers,
armed robbers, prison and street gangs, drug trafficking

organizations, and perpetrators of financial violations
(including money launderers, darknet vendors, digital currency
launderers, identity thieves and fraudsters).  For approximately
five years prior to investigating money laundering, I was
assigned to investigate child exploitation and sex trafficking.
In that assignment, I worked both independently and in a task
force where I led and participated in investigations related to
crimes involving the exploitation of children and sex
trafficking domestically and internationally.  In that capacity,
I also earned a designation by USPIS as a SME in Child
Exploitation Investigations.

2.    From 2002 to 2005, prior to my service as a U.S.
Postal Inspector, I served as a law enforcement officer with the
U.S. Immigration and Naturalization Service, which later became
part of the U.S. Department of Homeland Security.  In this
capacity I learned about human and drug smuggling and later,
worked in an intelligence unit for local and national counter-
terrorism and smuggling operations.

3.    I am familiar with the facts and circumstances
described herein.  This affidavit is based upon my personal
involvement in this investigation, my training and experience,
and information obtained from various law enforcement personnel
and witnesses, including information that has been reported to
me either directly or indirectly.  This affidavit does not

purport to set forth my complete knowledge or understanding of
the facts related to this investigation.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and part only.  All
figures, times, and calculations set forth herein are
approximate.

## II. SUMMARY AND PURPOSE OF AFFIDAVIT: SEARCH AND SEIZURE WARRANTS

4.   This affidavit is made in support of an application
for a warrant to search STANLEY ALEXANDER HUDSON's ("HUDSON")
residence at 205 W FAIRVIEW BLVD., INGLEWOOD, CA 90302 (the
"HUDSON PREMISES") for violations of 18 U.S.C. §§ 402, 1344,
1349, and 1956 (criminal contempt, bank fraud, money laundering,
and conspiracy), 21 U.S.C. §§ 846 and 841 (drug trafficking),
and 26 U.S.C. § 7201 (tax evasion) (the "Target Offenses").

5.   This affidavit is also made in support of an
application for a warrant to seize all cryptocurrency and
digital currency associated with certain digital wallets
previously owned and controlled by HUDSON (collectively, the
"TARGET WALLETS").  These digital wallets are specifically
described as follows:

a.   Tron Blockchain – Tron blockchain address
starting with "TK2m" and ending in "b3m" with a password
starting with "E6" and ending in "83";

b.   Apollo – Apollo recovery seed starting with the

- 3 -

word "shout" and ending with the word "belong";

       c.    Apollo – Apollo recovery seed starting with the word "even" and ending with the word "brush";

       d.    Wallet recovery seed starting with the word "filter" ending with the word "latin";

       e.    Wallet recovery seed starting with the word "wave" ending with the word "scatter"; and

       f.    Wallet recovery seed starting with the word "corn" ending with the word "grape".

    6.    For the reasons set forth below, I submit that there exists probable cause to believe that the funds contained in the TARGET WALLETS constitute or are derived from proceeds of the Target Offenses.

<u>Previous Search and GPS Warrants and Summary</u>

    7.    In March 2021, USPIS, FBI and DEA executed a federal search warrant at U.S. Private Vaults, a company who had been indicted for trafficking drugs and laundering money.  During the search, federal agents recovered a safety deposit box belonging to STANLEY HUDSON. On April 6, 2021, U.S. Magistrate Judge Audero authorized a warrant for the cell-site information, GPS information, and information from a cell-site simulator on the HUDSON Telephone (2:21-MJ-01638) based on an earlier version of this affidavit.  Judge Audero also authorized a warrant to search HUDSON's Safety Deposit Box.  Inside HUDSON's box was

$256,276 in cash.  This cash was placed in front of a certified drug K9 who alerted to odors of drugs.  Also inside the box were US Savings Bonds, and the TARGET WALLETS and other paper wallets and seed phrases not listed in this affidavit.  I later learned from analysts that these TARGET WALLETS contained over $400,000 which during the execution of the federal warrant at the business, were moved to other wallets not in the control of the government.

8.    Law enforcement used a cell-site simulator to locate HUDSON at the HUDSON PREMISES. Surveillance has observed HUDSON at the HUDSON PREMISES.  On June 17, 2021, the U.S. Magistrate Judge Abrams authorized the extension of a warrant for the cell-site information, GPS information, and information from a cell-site simulator on the HUDSON Telephone.  Based on phone GPS coordinates, I determined that HUDSON is currently spending his nights at the HUDSON PREMISES.

III. <u>PROBABLE CAUSE STATMENT</u>

9.    From my role as a case agent in the investigation as well as from speaking with the case agents from the Federal Bureau of Investigation ("FBI") and Drug Enforcement Administration ("DEA") and reading their reports, I know that U.S. Private Vaults is a business in a strip mall that rents safety deposit boxes anonymously. It is owned and managed by criminals who engage in money laundering, drug trafficking, and

structuring, among other offenses. Its business model is designed to appeal to criminals for customers. It charges many times what banks do for similar safety deposit box rentals, but staff conduct countersurveillance for customers, alert them to law enforcement investigations, and structure transactions for them to avoid filing currency reports--in addition to providing them a place to store criminal proceeds anonymously. USPV also launders for its customers cash that is purported to be drug proceeds by converting it into precious metals or wire transfers. The great majority of USPV customers pay cash to rent their safety deposit boxes, at least some of which USPV then deposits into their own bank account, which it uses to pay its operating expenses. By using its customers' criminal proceeds to maintain its own anonymous facility for the storage of criminal proceeds, USPV engages in money laundering.

10.  I know from reading the indictment that on March 9, 2021, USPV was indicted by a federal grand jury for conspiring with its customers and others to launder money, distribute drugs, and structure financial transactions to avoid currency reporting requirements.  A copy of that indictment is attached hereto (as Exhibit A) and incorporated herein as though fully set forth.

11.  Beginning on March 22 through March 26, 2021, I, along with agents from USPIS, FBI and DEA executed federal search and seizure warrants at USPV which authorized, among other things,

- 6 -

seizing the nests of safety deposit boxes at USPV as evidence and instrumentalities of the offenses committed by USPV.  The warrants did not authorize criminal searches of the contents of the individual boxes, but specified that agents would conduct an inventory of the contents in accordance with their written procedures, and were authorized to look for contact information in those individual boxes in order to notify the boxholders of the seizure so that they could seek the return of their property. An inventory search was conducted on all the boxes at USPV, including BOX 1401.

A. <u>HUDSON Asserts He Rented a Safety Deposit Box</u>

12.  On March 22, 2021, while the search warrant on USPV was being executed, a person later identified as HUDSON, walked up to law enforcement officers guarding the perimeter of the search operation.  I observed HUDSON speaking with officers and I went to speak with him.  I asked HUDSON for his name and identification and his safe deposit box number. He refused and quickly left.  A few hours later, HUDSON returned with two other individuals.  This time he spoke with Postal Inspector Noah Thompson.  Inspector Thompson later told me that HUDSON provided his name, identification card, contact information and stated that the contents of BOX 1401 belonged to him.

13.  On or about March 25, 2021, I observed FBI Special Agent Brent James conducting an inventory search of BOX 1401.  I

observed that in BOX 1401 were stacks of cash, a stack of $5,000 US Savings Bonds (I did not thumb through the stack but saw the Savings Bond on top of the stack was issued to STANLEY HUDSON in 2006), and several pages of what I recognized as cryptocurrency seed phrases, paper wallets and QR codes, which I know from my training and experience are associated with transacting and storing cryptocurrencies (which were later found to be the TARGET WALLETS). In my training, I know that seed phrases can be likened to a password for the crypto currency. If one has a copy of the series of seed words, one can reconstitute and recreate the cryptocurrency wallet and gain control and access to all the crypto currency contained in the wallet.

14. Based on my training and experience, I know that many criminals like to store their wealth in cryptocurrencies in order to avoid the anti-money laundering programs of financial institutions and to hide their ill-gotten gains from law enforcement or tax authorities.

B.   Drug Detecting K9 Alerted to the Cash in BOX 1401

15. On June 16, 2021, I read a declaration from El Monte Police Detective who handles a drug detecting K9, "Rico." From his declaration I learned that on March 25, 2021, at approximately 6:14 am, while the search warrant for USPV was being executed, federal agents presented the cash from BOX 1401 to "Rico." Detective Girgle said in his declaration that "Rico

conducted a search of the contents of safe number 1401 and alerted to the presence of scent of narcotics on or in the US Currency."

16. On April 22, 2021, I spoke with Det. Girgle who stated: Rico must receive a minimum of 320 hours of training per year, but actually receives more. As part of his yearly certification process, Rico is subjected to a blind, controlled test in which different types of drugs are hidden in different places in a large training facility. His handler does not know where the narcotics are. If Rico alerts to an area that does not contain drugs, or fails to locate any of the narcotics, he would fail and not be certified.

C. The TARGET WALLETS Are Found in HUDSON's USPV BOX

17. On April 6, 2021, the Honorable U.S. Magistrate Judge Maria A. Audero authorized a warrant to search the contents of HUDSON's BOX. I later retrieved copies of the cryptocurrency seed phrases, paper wallets and QR codes from HUDSON's BOX. They include the TARGET WALLETS, namely:

a. Tron Blockchain – Tron blockchain address starting with "TK2m" and ending in "b3m" with a password starting with "E6" and ending in "83";

b. Apollo – Apollo recovery seed starting with the word "shout" and ending with the word "belong";

c. Apollo – Apollo recovery seed starting with the

- 9 -

word "even" and ending with the word "brush";

        d.    Wallet recovery seed starting with the word "filter" ending with the word "latin";

        e.    Wallet recovery seed starting with the word "wave" ending with the word "scatter"; and

        f.    Wallet recovery seed starting with the word "corn" ending with the word "grape".

18.    On or about April 29, 2021, I spoke with Postal Inspector Portell who told me that he conducted research on the blockchain on the TARGET WALLETS. Inspector Portell told me that the TARGET WALLETS have some remaining cryptocurrency, however most have been depleted into other wallets not in the government's possession. Inspector Portell told me that the wallets contained almost $400,000 at the time they were depleted but estimated that as of April 2021, only $50,000 remained in the TARGET WALLETS.

    D. <u>HUDSON Was Sentenced to 94-Months in Prison for Credit Card Fraud, with Restitution Over $850,000</u>

19.    On March 29, 2021, I reviewed HUDSON's criminal records and case files and learned that Postal Inspectors previously arrested HUDSON for a synthetic identity theft scheme. HUDSON was convicted around November 2009 for his role in the scheme and sentenced to 94 months in federal custody and five years of supervised release.

20.    On March 30, 2021, I learned from a report produced by

- 10 -

the clerk of court that HUDSON initially owed $872,125.52 in restitution from his 2009 conviction. Of the $872,125.52, HUDSON has only paid $17,084.25.

HUDSON Appears to Structure Cash Transaction

21.  On April 1, 2021, I reviewed banking and financial records related to HUDSON.  From my review I learned the following:

     a.    From reading banking records from US Bank, I learned that between March 3, 2015 when he opened his account through April 29, 2015, HUDSON conducted 13 cash deposits totaling $30,536 in a range of $26 to $7,900. Based on my training and experience, I believe that HUDSON's activity is indicative of structuring to avoid the currency transaction reporting requirement of cash transactions of more than $10,000.

     b.    Between July and December 2018, HUDSON, using mostly ATM machines, deposited $14,696.02 into his account. These cash deposits were then depleted into numerous transfers to Coinbase, a cryptocurrency exchange.

     c.    From reading financial records from Coinbase, I learned that between August 07, 2018 and October 28, 2018, HUDSON used $7,344 worth of bitcoins to make purchases from "CC Clinique" a marketplace on the dark web, which is known to some law enforcement and criminals as a place to purchase stolen credit card information.  ("CC" is shorthand for "Credit Card".)  Dark

web purchases are commonly conducted in bitcoin because the criminals who use the dark web do not want their transaction subject to the regulations and scrutiny associated with transfers through banks, such credit card payments or wire transfers. In my training and experience, all credit cards in the U.S. are issued by banks, and all those banks are federally insured.

22.   I read HUDSON's net worth disclosure form to probation dated April of 2020. In it he lists a Bank of America account of $2,400, and a Chase retirement account of $38,000, and no other financial assets. He did not disclose any cash, cryptocurrency, or savings bonds.

23.   On June 15, 2021, I reviewed records from the California Franchise Tax Board.  From this review I learned that HUDSON has been filing taxes but shows no income to support the cash found in his BOX.  In 2014, HUDSON claimed his adjusted gross income in state of California to have been <u>negative</u> $41,708.  In 2015, HUDSON claimed his adjusted gross income in state of California to have been <u>negative</u> $40,238.  In 2016, HUDSON claimed his adjusted gross income in state of California to have been <u>negative</u> $21,661.   In 2017, HUDSON claimed his adjusted gross income in state of California to have been $4,236.   In 2018, HUDSON claimed his adjusted gross income in state of California to have been <u>negative</u> $12,290.

E. HUDSON Resides at the HUDSON PREMISES

24.    On April 23, 2021, FBI agents conducted surveillance at the HUDSON PREMISES.  During this surveillance they observed a 2021 Mercedes SUV parked in the driveway of the HUDSON PREMISES.  The Mercedes was registered to HUDSON.

25.    On April 29, 2021, an FBI surveillance team, following HUDSON's phone coordinates, conducted surveillance at the HUDSON PREMISES.  FBI agents later told me that during this surveillance at the HUDSON PREMISES, they saw HUDSON (who they recognized from his California DMV Photo) leave the HUDSON PREMISES in an SUV.  The surveillance team also observed that based on HUDSON's behavior, that it appeared that HUDSON detected the surveillance team observing him.  That afternoon, I determined that HUDSON and three other targets not named in this affidavit were unable to be located by the service provider, which I know to mean that these Targets turned their cellphones off. Having watched some of the Target Telephone for a few weeks, this seemed unusual to me. To avoid further suspicion from these subjects, I asked law enforcement surveillance teams to stop surveilling these HUDSON and the other Targets.  After the surveillance detection, I observed the HUDSON and the other Targets would keep their phone off but once or twice in a day, they would turn back on.  Over several days, they would leave them on for longer periods and more often, before shutting them

off.  I estimate that it took over two weeks before the HUDSON and the other Targets began to leave their phones back on. I know from reviewing toll records of all the HUDSON and the other Target's telephones, these Targets are in regular communication with each other. I believe that when HUDSON discovered law enforcement surveillance, it is likely that he directly or indirectly alerted the other targets, which resulted in all phones being turned off.

26.  Additionally, at the time the surveillance was detected by HUDSON, pursuant to Judge Audero's authorized warrant, I had already received regular coordinates from HUDSON's phone provider. And during that time, HUDSON's phone coordinates were consistently showing HUDSON near the HUDSON PREMISES where he detected law enforcement surveillance.  When HUDSON began to turn his phone back on, it was in Lancaster, CA, area.  And almost every night, HUDSON's phone coordinates showed that it stayed in Lancaster instead of where he was previously showing at the HUDSON PREMISES.  One or two days a week, HUDSON would spend the night at the HUDSON PREMISES, but the rest of the time, he would stay in Lancaster.

27.  Based on my training and experience, I know that surveillance conscious criminals are aware that law enforcement would exploit mobile devices to locate suspects, listen to conversations and identify a criminal network. I believe that

- 14 -

based on their reaction to surveillance, the HUDSON and the other Targets are surveillance conscious.

28.   On June 17, 2021, the Honorable U.S. Magistrate Judge Paul A. Abrams authorized the extension of a warrant for the cell-site information, GPS information, and information from a cell-site simulator on the HUDSON Telephone (21-MJ-2926).   I have since been tracking the HUDSON Telephone almost daily and have confirmed that HUDSON has been spending most of his nights and days at the HUDSON PREMISES.

29.   On July 22, 2021, I searched DMV records and confirmed that HUDSON's listed address on his driver's license is the HUDSON PREMISES.

30.   On July 23, 2021, I reviewed results from a Westlaw Public Records search of 205 W FAIRVIEW BLVD., INGLEWOOD, CA 90302 (the HUDSON PREMISES).   It listed five phone records associated with this address, although some were for the same numbers, and all were variations of HUDSON's name (i.e., Stanley Alexander, Stanley Hudson, Hudson Stanley) with first reporting dates in the 2015-17 range.   The tax assessor record for the HUDSON PREMISES shows that it is "owner occupied" by "Stanley A Hudson," and that the property is a "single family residence."

31.   Also on July 23, 2021, I learned there is one mailing address for the HUDSON PREMISES lot according to USPS records, and one utility connection (in the name "Hudson") for it from the

utility company.

## IV. TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES

32. Based on my experience and training, and based on my consultation with other law enforcement officers, I know that:

a. Individuals involved in drug trafficking, money laundering, fraud, and structuring schemes usually keep evidence of their schemes, such as pay-owe sheets, contact information for their co-conspirators, suppliers and customers, and records documenting the movement of criminal peeds.

b. Individuals who launder money, structure cash, or commit bank fraud also keep ATM receipts, deposit slips, money order stubs and other evidence of financial instruments and transactions, to keep track of all the deposits and other times, keep this type of evidence at home or on their person out of careless behavior.

c. Individuals who structure cash, avoid taxes or avoid paying restitution, would often keep true records of their deposits at places they can feel safe, like their homes.

d. These individuals often use the proceeds of their crimes to purchase expensive items, or store the proceeds in the form of cash to make it more difficult to trace.

e. Individuals involved in such offenses need to communicate with their co-conspirators about their criminal activity. There are usually records of those communications in

- 16 -

their electronic devices, such as cellular telephones.

      f.   Typically, they maintain the evidence where it is close at hand and safe, such as in their residences, vehicles, and digital devices, which are also commonly stored in their residences and vehicles.  Such individuals commonly use digital devices to communicate with their fellow participants by phone, email and text messages.  I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded.  Computers, tablets and cell phones can be used to communicate between co-conspirators and may contain information relating to the crime under investigation.

      g.   I know from training and experience that individuals involved in fraud keep the most damaging evidence and/or proceeds of the scheme at their residences, vehicles, garages and to help conceal the fraud from their fellow coworkers who may have access to such documents at the workplace.  More sophisticated or cagey criminals may rent public storage units or safety deposit boxes, especially when storing valuables such as cash, to further distance themselves from incriminating evidence.

      h.   I know from training and experience that individuals who are evading paying taxes would keep funds

- 17 -

outside of traditional banking and would rather keep valuables and cash at places out of FTB or IRS reach such as USPV, or at their homes.

### V. SEIZURE OF CRYPTO WALLETS

33.  USPIS is able to establish a law enforcement controlled cryptocurrency wallet.  I also know that Coinbase, Kraken, and Circle, all of which have domestic United States offices, will comply with U.S. Government legal demands to send cryptocurrency balances held on their respective platforms and contained within their respective wallets and/or on their respective exchanges to the securely established law enforcement controlled cryptocurrency wallet which would then be processed as assets seized from HUDSON.

34.  Because law enforcement is now in possession of the recovery seed (also sometimes referred to as mnemonic phrase, root key, backup phrase, or private key) for the TARGET WALLETS as described above, I know that those particular wallet/exchange balances can be "recovered" or "reconstituted" off the blockchain using a law enforcement controlled cryptocurrency wallet.  Law enforcement would transfer the available account balances as seized assets out of the TARGET WALLETS controlled by HUDSON and into custody in wallets controlled by law enforcement.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

35.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places

where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

36.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to

- 20 -

inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

37.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.      In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.      Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb and/or fingers of STANLEY HUDSON on the device(s); and (2) hold the device(s) in front of those persons' faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

38.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

39.  For the reasons stated above, there is also probable cause to believe that evidence and proceeds of the Target Offenses, as described more particularly in Attachment B, are in the HUDSON PREMISES.

40.  Also based on the facts recounted above, there is also probable cause to believe that the funds remaining in the TARGET WALLETS constitute and are derived from proceeds traceable to the Target Offenses, and were involved in and facilitated money laundering, and are therefore subject to seizure pursuant to 21 U.S.C. § 853(f), 18 U.S.C. §§ 981 and 984, and 28 U.S.C. § 2461(c).

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of August, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

FILED
CLERK, U.S. DISTRICT COURT

03/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>U.S. PRIVATE VAULTS, INC.,<br>   California Corporate<br>   Number C3405297,<br><br>          Defendant. | CR 2:21-cr-00106-MCS<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1956(h): Conspiracy<br>to Launder Money; 21 U.S.C. § 846:<br>Conspiracy to Distribute<br>Controlled Substances; 18 U.S.C.<br>371: Conspiracy to Structure<br>Transactions; 18 U.S.C.<br>§ 982(a)(1), 21 U.S.C. §§ 853 and<br>881(a)(6), 28 U.S.C. § 2461(c) and<br>31 U.S.C. § 5317(c): Criminal<br>Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1956(h)]

A.   INTRODUCTORY ALLEGATIONS

1.   At times relevant to this Indictment:

     a.   Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada Corporation registered with the California Secretary of State, was in the business of renting safety deposit boxes to individuals who wished to do so anonymously.

     b.   Co-conspirator USPV Officer was an officer of USPV and

one of its owners.  USPV Officer dealt in marijuana, in violation of the laws of California, as well as cocaine.

c.   Co-conspirator USPV Manager was the manager of USPV. USPV Manager helped USPV Officer arrange drug deals within USPV, and helped USPV customers avoid detection by law enforcement, including by advising them to structure their cash purchases to avoid reporting requirements.

d.   Co-conspirator Gold Business was a dealer in precious metals and jewelry, and shared the same space as USPV, as well as some employees.  Gold Business helped USPV customers convert their cash into gold, and structured their cash transactions to avoid federal reporting requirements.

e.   Co-conspirator USPV Representative One was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative One instructed USPV customers how to structure transactions to avoid federal reporting requirements.

f.   Co-conspirator USPV Representative Two was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative Two instructed USPV customers how to structure transactions to avoid federal reporting requirements.

B.   THE OBJECTS OF THE CONSPIRACY

2.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant USPV conspired with others known and unknown to the Grand Jury to launder money, in violation of Title 18, United States Code, Section 1956, namely:

a.   to knowingly conduct and attempt to conduct financial transactions involving the proceeds of a specified unlawful activity,

that is, the distribution of controlled substances, with the intent to promote the carrying on of that specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

　　　　　b.　to knowingly conduct and attempt to conduct financial transactions involving the proceeds of specified unlawful activity, that is, the distribution of controlled substances, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

　　　　　c.　to knowingly conduct and attempt to conduct financial transactions involving the proceeds of specified unlawful activity, that is, the distribution of controlled substances, knowing that the transactions were designed in whole or in part to avoid a transaction reporting requirement under Federal law, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii).

C.　<u>MANNER AND MEANS OF THE CONSPIRACY</u>

　　　3.　The objects of the conspiracy were carried out and were to be carried out, in substance, as follows:

　　　　　a.　Defendant USPV would adopt business practices that attracted customers in possession of proceeds from criminal offenses, including drug trafficking, and not law-abiding persons.  Such practices included: (1) touting the anonymity of the safety deposit rentals that defendant USPV would provide, including by advertising "we don't even want to know your name"; (2) boasting that, unlike banks, its anonymous safety deposit box rentals did not require customer information that "can be easily accessed by government agencies (such as the IRS)"; (3) making arrangements for the payment

3

of the rental fees in cash and other ways that would be untraceable;
(4) issuing safety deposit box keys that were unmarked and unnumbered
so that law enforcement could not determine that the keys unlocked
safety deposit boxes at USPV; and (5) charging safety deposit box
rental rates several times higher than those at banks.

b. USPV Officer would capitalize defendant USPV with the
proceeds of his illegal drug trafficking.

c. USPV Officer would invite other drug traffickers who
knew and trusted him because of his illegal drug trafficking to store
the proceeds of their drug trafficking at defendant USPV.

d. Employees of defendant USPV would conduct counter
surveillance of the neighborhood and warn customers when they
observed law enforcement.

e. Agents of defendant USPV would instruct customers to
structure transactions to avoid currency transaction reports
including by purchasing gold and other precious metals through Gold
Business, which would structure transactions and not file required
currency reports.

f. If agents of defendant USPV learned that law
enforcement was interested in searching or seizing the contents of a
particular customer's safety deposit box, they would attempt to warn
the customer, delay law enforcement, or even remove all but a nominal
amount of cash from the box for the customer, to prevent law
enforcement from discovering and seizing the bulk of the cash.

g. Defendant USPV would deposit the cash proceeds it
received from its customers for safety deposit box rentals, which
included proceeds from the distribution of controlled substances,
into its bank account, and then use those proceeds to maintain USPV's

anonymous storage facilities for its criminal customers.

   h. USPV Officer and USPV Manager would negotiate drug deals illegal under California law within the secured space of USPV, and USPV Officer would store the cash proceeds from drug deals within a safety deposit box at USPV.

   i. USPV Manager would accept cash purportedly from illegal drug sales, and structure transfers of it to Gold Business in amounts not greater than $10,000 at a time in exchange for wire transfers that purported to be for the sale of precious metals.

COUNT TWO

[21 U.S.C. § 846]

4.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

5.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

B.   MANNER AND MEANS OF THE CONSPIRACY

6.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

7.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1:  On June 28, 2019, USPV Manager distributed within USPV's business location six different butane hash oil vape cartridges containing THC to someone he believed to be a drug trafficker, but who was, in fact, a confidential informant working with law enforcement ("Confidential Informant 3"), as samples of what

defendant USPV could provide in bulk.

Overt Act No. 2: On July 26, 2019, USPV Officer met Confidential Informant 3 within USPV to sell him 1,000 vape cartridges containing THC.  USPV Officer delivered the cartridges in the parking lot of USPV, and received in exchange $8,000 in cash within USPV's business location.

Overt Act No. 3:  On or about December 11, 2019, during discussions for the sale of cocaine, USPV Officer instructed the buyer, Confidential Informant 3, to use a wireless communication application called "Signal," which is encrypted to communicate with him regarding the transaction.

Overt Act No. 4:  On or about December 16, 2019, USPV Officer instructed Confidential Informant 3 to come to USPV to complete the exchange.

Overt Act No. 5:  On or about December 16, 2019, USPV Manager called Confidential Informant 3 and explained that co-conspirator USPV Officer was not being careful enough, and could bring unwanted law enforcement attention to defendant USPV by conducting this drug deal onsite.

Overt Act No. 6:  On or about December 18, 2019, USPV Officer sold an ounce of cocaine to Confidential Informant 3 through intermediaries.

COUNT THREE

[18 U.S.C. § 371]

8.    The Grand Jury realleges paragraph 1 of this Indictment here.

A.    OBJECTS OF THE CONSPIRACY

9.    Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to knowingly and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the regulations promulgated thereunder: (1) cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and (2) structure, assist in structuring, and attempt to structure and assist in structuring, transactions with one or more nonfinancial trades or businesses, in violation of Title 31, United States Code, Section 5324(b)(3).

B.    MANNER AND MEANS OF THE CONSPIRACY

10.    The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.    OVERT ACTS

11.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but

8

not limited to the following:

Overt Act No. 1: On December 4, 2019, Gold Business sold jewelry for $11,900 in cash to a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 1"), and did not file the required IRS Form 8300.

Overt Act No. 2: On January 13, 2020, USPV Representative One told a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 4"), and who expressed an interest in buying $20,000 worth of precious metals in cash, to purchase only $10,000 at a time to avoid paperwork.

Overt Act No. 3: On January 28, 2020, USPV Representative Two told a DEA agent who was posing as a USPV customer and said he wanted to purchase $18,000 in gold, "I recommend you stay under $10,000 in cash and then you could just do some one day, and a few days later you could do the other," and explained, "If you buy less than $10,000 then there's no form."

Overt Act No. 4: On January 29, 2020, USPV Manager instructed Confidential Informant 3, who wanted to buy gold to pay a "skante" debt "down south," meaning a debt in Mexico for methamphetamine, to keep his purchases under $10,000 each: "That way you don't have to give no social security, no ID. All that shit goes to the IRS." USPV Manager introduced Confidential Informant 3 to co-conspirator USPV Representative One to purchase the gold.

Overt Act No. 5: On January 29, 2020, USPV Representative One explained to Confidential Informant 3 and his friend, who was actually an undercover police officer ("Undercover Officer"), that it was better to space out his cash purchases and keep each one under

$10,000:  "Don't come in every day. . . . what they look for is a pattern of someone who with intention is trying to get around . . ."

Overt Act No. 6:  On January 29, 2020, when Undercover Officer explained that he needed more than $10,000 worth of gold quickly, USPV Manager suggested that he split the purchase between himself and Confidential Informant 3, so that each purchase would be under $10,000 individually.  USPV Representative One agreed to the ruse "as long as you hand me the money" separately and fill out receipts for two separate transactions.  USPV Representative One also agreed that Undercover Officer could pick up the total gold purchase alone the following day.

Overt Act No. 7:  On January 29, 2020, USPV Representative One accepted first $9,900 in cash from Undercover Officer and then another $5,000 which Undercover Officer handed to Confidential Informant 3, who then handed it to USPV Representative One.

Overt Act No. 8:  On January 30, 2020, USPV Representative One delivered nine ounces of gold bullion to Undercover Officer.

Overt Act No. 9:  On November 17, 2020, USPV Manager accepted $25,000 in cash from Confidential Informant 3, who said it was from the sale of "skante" (methamphetamine), and structured the transfer of it to Gold Business in exchange for wire transfers of $10,000 and $12,000, purportedly from the sale of gold, to launder the cash.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.    Defendant USPV shall forfeit to the United States the following property:

a.    All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

b.    A sum of money equal to the total value of the property described in subparagraph a above.

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

a.    The business computers;

b.    The money counters;

c.    The nests of safety deposit boxes and keys;

d.    The digital and video surveillance and security equipment; and

e.    The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b),

11

defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

and 21 U.S.C. § 853]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 881(a)(6), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853, in the event of defendant USPV's conviction under Count Two of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal:

i.   constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; or

ii.   used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

///

13

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on one or more of the grounds set forth in paragraph 2 above:

a.    The business computers;

b.    The money counters;

c.    The nests of safety deposit boxes and keys;

d.    The digital and video surveillance and security equipment; and

e.    The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

14

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

1.  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), in the event of defendant USPV's conviction under Count Three of this Indictment.

2.  Defendant USPV shall forfeit to the United States the following property:

   a.  All right, title, and interest in any and all property, real or personal, involved in or traceable to the offense set forth in Count Three of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

   b.  A sum of money equal to the total value of the property described in subparagraph a above.

3.  The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

   a.  The business computers;

   b.  The money counters;

   c.  The nests of safety deposit boxes and keys;

   d.  The digital and video surveillance and security equipment; and

   e.  The biometric scanners

4.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section

15

5317(c)(1)(B), and Title 28, United States Code, Section 2461(c),
defendant USPV shall forfeit substitute property, up to the value of
the property described in paragraph 2 above if, as the result of any
act or omission of defendant USPV, the property described in
paragraph 2 above or any portion thereof (a) cannot be located upon
the exercise of due diligence; (b) has been transferred, sold to, or
deposited with a third party; (c) has been placed beyond the
jurisdiction of the court; (d) has been substantially diminished in
value; or (e) has been commingled with other property that cannot be
divided without difficulty.

A TRUE BILL

/S/

_____
Foreperson

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

ANDREW BROWN
Assistant United States Attorney
Major Frauds Section